**FEE DUE**

ORIGINAL COPY

**Herbert Cornejo Mendez**
NAME

**#BA3229**
PRISON IDENTIFICATION/BOOKING NO.

**Pelican Bay State Prison P.O. Box 7500**
ADDRESS OR PLACE OF CONFINEMENT

**Crescent City, California 95532**

Note:    It is your responsibility to notify the Clerk of Court in writing of any change of address. If represented by an attorney, provide his or her name, address, telephone and facsimile numbers, and e-mail address.

---

**F I L E D**
CLERK, U.S. DISTRICT COURT

**APR 21 2023**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ rsm _____ DEPUTY

---

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

CASE NUMBER:

**Herbert Cornejo Mendez**

FULL NAME (Include name under which you were convicted)

Petitioner,

CV **5:23-CV-00734-JGB-SHK**
To be supplied by the Clerk of the United States District Court

v.

☐    **AMENDED**

**Jim M. Robertson**

NAME OF WARDEN, SUPERINTENDENT, JAILOR, OR AUTHORIZED PERSON HAVING CUSTODY OF PETITIONER

Respondent.

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**
28 U.S.C. § 2254

PLACE/COUNTY OF CONVICTION    **Riverside County**
PREVIOUSLY FILED, RELATED CASES IN THIS DISTRICT COURT (List by case number)
CV _____
CV _____

---

### INSTRUCTIONS - PLEASE READ CAREFULLY

1.    To use this form, you must be a person who either is currently serving a sentence under a judgment against you in a California state court, or will be serving a sentence in the future under a judgment against you in a California state court. You are asking for relief from the conviction and/or the sentence. This form is your petition for relief.

2.    In this petition, you may challenge the judgment entered by only one California state court. If you want to challenge judgments entered by more than one California state court, you must file a separate petition for each court.

3.    Make sure the form is typed or neatly handwritten. You must tell the truth and sign the form. If you make a false statement of a material fact, you may be prosecuted for perjury.

4.    Answer all the questions. You do not need to cite case law, but you do need to state the federal legal theory and operative facts in support of each ground. You may submit additional pages if necessary. If you do not fill out the form properly, you will be asked to submit additional or correct information. If you want to submit a legal brief or arguments, you may attach a separate memorandum.

5.    You must include in this petition all the grounds for relief from the conviction and/or sentence that you challenge. You must also state the facts that support each ground. If you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.

6.    You must pay a fee of $5.00. If the fee is paid, your petition will be filed. If you cannot afford the fee, you may ask to proceed in forma pauperis (as a poor person). To do that, you must fill out and sign the declaration of the last two pages of the form. Also, you must have an authorized officer at the penal institution complete the certificate as to the amount of money and securities on deposit to your credit in any account at the institution. If your prison account exceeds $25.00, you must pay the filing fee.

7.    When you have completed the form, send the original and two copies to the following address:

Clerk of the United States District Court for the Central District of California
United States Courthouse
ATTN: Intake/Docket Section
255 East Temple Street, Suite TS-134
Los Angeles, California 90012

---

PLEASE COMPLETE THE FOLLOWING (*check appropriate number*):

This petition concerns:
1. ☒ a conviction and/or sentence.
2. ☐ prison discipline.
3. ☐ a parole problem.
4. ☐ other.

## PETITION

1. Venue
   a. Place of detention ___ Pelican Bay State Prison
   b. Place of conviction and sentence ___ Superior Court of California County of Riverside

2. Conviction on which the petition is based (*a separate petition must be filed for each conviction being attacked*).
   a. Nature of offenses involved (*include all counts*): First Degree Murder with special circumstance of lying-inwait, as well as the allegation of personal use of a deadly weapon.

   b. Penal or other code section or sections: (P.C § 187(a)) (P.C. § 192(a)(15) ) (P.C. § 12022 (b)(1)).

   c. Case number: ___ INF1301168
   d. Date of conviction: March 29, 2016
   e. Date of sentence: June 8, 2016
   f. Length of sentence on each count: Life Without Parole

   g. Plea (*check one*):
      ☒ Not guilty
      ☐ Guilty
      ☐ Nolo contendere
   h. Kind of trial (*check one*):
      ☒ Jury
      ☐ Judge only

3. Did you appeal to the California Court of Appeal from the judgment of conviction?    ☒ Yes  ☐ No

   If so, give the following information for your appeal (*and attach a copy of the Court of Appeal decision if available*):
   a. Case number: INFD301168 (D078710)  (Please see attachment-A for Court of Appeal decision)
   b. Grounds raised (*list each*):
      (1) ___ (Please see attachment-B)
      (2) ___ (Please see attachment-B)

Attachment-A

(Court of Appeal decision)
Unpublished Opinion By The Fourth Appellate
District, Division One Filed On July 7, 2022

Because Mendez's statements were not induced by promises such that his

free will was overborne, the trial court's determination of voluntariness is

affirmed.[5]

### DISPOSITION

The order reinstating the judgment of conviction is affirmed.

McCONNELL, P. J.

WE CONCUR:

AARON, J.



KEVIN J. LANE, Clerk of the Court of Appeal, Fourth
Appellate District, State of California, does hereby Certify
that the proceeding is a true and correct copy of the Original
of this document/order/opinion filed in this Court, as shown
by the records of my office.

WITNESS, my hand and the Seal of this Court.

07/07/2022

KEVIN J. LANE, CLERK

By A. Galvez
Deputy Clerk

DATO, J.

---

5      Mendez does not argue that his confessions to Gomez should be
excluded independently of his earlier confessions to Curtis. Rather, he
contends they were tainted by the earlier confessions, rendering them
inadmissible. Because we uphold the trial court's finding that the confessions
to Curtis were voluntary, we do not reach Mendez's argument that his
subsequent confessions to Gomez were inadmissible fruit of a coerced
confession. (See *Mendez I, supra,* D073443 ["If the trial court concludes after
a full hearing that Mendez was not induced by promises such that his free
will was overborne, the judgment may be reinstated."].)

```
                    Attachment-B
              3.(b)(Grounds raised)
```

Continued from page 2 of 11:

(3)(b)                           GROUNDS RAISED:

(1)

DEFENDANT REQUESTS THE EXCLUSION OF ALL HIS STATEMENTS TO FBI AGENT
BRETT CURTIS AS INVOLUNTARILY MADE, AS THEY WERE THE RESULT OF DI_
RECT OR IMPLIED PROMISES OF REFUGE IN THE UNITED STATES IN EXHANGE
FOR INFORMATION ON THE ALLEGD HOMICIDE

(A)

FBI Agent Curtis Promised Defendant Assistance in Acquring His Sought
After Return To The United States and Legal Residency There, to Avoid
The Fear of Death Should He Remain In El Salvador, In Exchange for His
Confession To Involvement In the Alleged Homicide and His Cooperation
With Law Enforcement In The United States.

(B)

DEFENDANT'S STATEMENTS TO THE FBI RELATING TO THE HOMICIDE OF ANGEL
PALACIOS WERE THE RESULT AND CAUSED BY THE PROMISES OF REFUGE IN THE
UNITED STATES BY THE FBI.

(C)

Defendant's Involuntary Confession To FBI Agents Cannot Then Be Used
Against Him In Trial, And Must Be Excluded.

GROUNDS RAISED:

(2)

DEFENDANT'S SUBSEQUENT ALLEGED CONFESSION TO INVESTIGATOR GOMEZ WAS
THE RESULT OF THE INVOLUNTARINESS OF HIS STATEMENTS TO THE FBI THUS UN-
DERTHE DOCTRINE OF FRUIT OF THE POISONOUS TREE, MR. MENDEZ'S STATEMENTS
TO INVESTIGATOR GOMEZ MUST ALSO BE EXCLUDED. AS SUCH STATEMENTS CONTINUE
TO BE TAINTED BY THE INITIAL VIOLTION OF DEFENDANT'S 5TH AND 14TH AMEND-
MENTS RIGHTS, AND SUCH STATMENTS WERE AS WELL INVOLUNTARY.

(A)

While Defendant Is Claimed to Have Waived His Rights Under Miranda, De-
fendant Argues That This Waiver Was Not Knowingly And Intelligently
Made, Nor Voluntarily Done.

(3) _____

(4) _____

(5) _____

(6) _____

c.  Date of decision: ___July 07/2022_____

d.  Result ____Conviction Affirmed_____

4.  If you did appeal, did you also file a Petition for Review with the California Supreme Court of the Court of Appeal decision?    ☒Yes    ☐No

If so, give the following information *(and attach copies of the Petition for Review and the Supreme Court ruling if available)*:

a.  Case number: ___D078710_____

b.  Grounds raised *(list each)*:

(1) _____(Same as outlined in attachment-B)_____

(2) _____(See Petition for Review at attachment-F)____

(3) _____

(4) _____

(5) _____

(6) _____

c.  Date of decision: ___Not Known_____

d.  Result ___Denied/Affirmed_____

5.  If you did not appeal:

a.  State your reasons _____N/A_____

_____

_____

_____

_____

b.  Did you seek permission to file a late appeal?    ☐Yes    ☐No

6.  Have you previously filed any habeas petitions in any state court with respect to this judgment of conviction?

☐ Yes    ☒ No

If so, give the following information for each such petition *(use additional pages, if necessary, and attach copies of the petitions and the rulings on the petitions if available)*:

a.  (1) Name of court: _____N/A_____

(2) Case number: _____

(3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

(4) Grounds raised *(list each)*:

    (a) _____

    (b) _____

    (c) _____

    (d) _____

    (e) _____

    (f) _____

(5) Date of decision: _____

(6) Result _____

_____

(7) Was an evidentiary hearing held?    ☐ Yes    ☐ No


b.  (1) Name of court: _____

    (2) Case number: _____

    (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

    (4) Grounds raised *(list each)*:

        (a) _____

        (b) _____

        (c) _____

        (d) _____

        (e) _____

        (f) _____

    (5) Date of decision: _____

    (6) Result _____

_____

    (7) Was an evidentiary hearing held?    ☐ Yes    ☐ No


c.  (1) Name of court: _____

    (2) Case number: _____

    (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

    (4) Grounds raised *(list each)*:

        (a) _____

        (b) _____

        (c) _____

        (d) _____

        (e) _____

        (f) _____

(5) Date of decision: _____

(6) Result _____

_____

(7) Was an evidentiary hearing held?      ☐ Yes ☐ No

7.   Did you file a petition for certiorari in the United States Supreme Court?      ☐ Yes      ☒ No

If yes, answer the following:

(1) Docket or case number (if you know): _____

(2) Result: _____

_____

(3) Date of result (if you know): _____

(4) Citation to the case (if you know): _____

8.   For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States.  Attach additional pages if you have more than five grounds.  Summarize briefly the facts supporting each ground.  For example, if you are claiming ineffective assistance of counsel, you must state facts specifically setting forth what your attorney did or failed to do.

**CAUTION:**    *Exhaustion Requirement*:  In order to proceed in federal court, you must ordinarily first exhaust your state court remedies with respect to each ground on which you are requesting relief from the federal court.  This means that, prior to seeking relief from the federal court, you first must present all of your grounds to the California Supreme Court.

a.   Ground one: _____ (Please see attachment-C) _____

(1) Supporting FACTS: _____ (Please see attachment-D) _____

_____

_____

_____

(2) Did you raise this claim on direct appeal to the California Court of Appeal?      ☒ Yes ☐ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?      ☒ Yes ☐ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?      ☐ Yes ☒ No

b.   Ground two: _____ (Please see attachment-E) _____

(1) Supporting FACTS: _____ (Please refer to attachment-D / Same facts) _____

_____

Attachment-C

a. Ground One

1. From page 5 of 11

2. a.(1)                           GROUND ONE:

3. DEFENDANT REQUESTS THE EXCLUSION OF ALL HIS STATEMENTS TO FBI AGENT

4. BRETT CURTIS AS INVOLUNTARILY MADE, AS THEY WERE THE RESULT OF DI-

5. RECT OR IMPLIED PROMISES OF REFUGE IN THE UNITED STATES IN EXCHANGE

6.                     FOR INFORMATION ON THE ALLEGD HOMICIDE

7.         Defendant/Appellant asserts that his statements to FBI and Riverside

8. County Sheriff's Officers were involuntary as they were falsely made as a

9. result of direct and/or implied promises of refuge in the United States, in

10. exchange for client's alleged confession to his involvement in a homicide in

11. the United States.

12.         "If it is, if he has willed to confess, it may be used against him.  If

13. it is not, if his will has been overborne and his capacity for self-deter-

14. mination critically impaired, the use of his confession offends due process.

15. [Citation] The line of distinction is that at which governing self-direction

16. is lost and compulsion, of whatever nature or however infused, propels or

17. helps to propel the confession."  (Culombe v. Connecticut (1961) 367 U.S.

18. 568, 602.) Mr. Mendez's statements to were not made voluntarily, as they were

19. provided as the result of promises made by Agent Curtis to provide Defendant

20. MENDEZ legal return to the United States.  Thus admission of the statements

21. at trial would violate his right to due process of law guaranteed by the

22. Fourteenth Amendment to the United States Constitution. (Jackson v. Denn (19

23. 64) 378 U.S. 368.)

24.         The due process clause of the Fifth and Fourteenth Amendments preclude

25. the admission, for any purpose, of any involuntary or coerced statement ob-

26. tained from a criminal suspect through state compulsion.  A statement is in-

27. voluntary if it is not the procuct of "a rational intellect and free will"

28. (Mincey v. Arizona (1978) 437 U.S. 385, 398; Dickerson v. U.S. (2000) 530

1. Cont'd from page 5 of 11:

2. 530 U.S. 428).

3.    A. FBI Agent Curtis Promised Defendant Assistance in Acquiring His Sought

4.       After Return To The United States and Legal Residency There, to Avoid

5.       The Fear of Death Should He Remain In El Salvador, In Exchange for His

6.       Confession To Involvement In the Alleged Homicide and His Cooperation

7.       With law Enforcement In The United States.

8.    Defendant MENDEZ testified at the hearing that he was in fear for his

9. life upon his 3rd return to his home country of El Salvador. That this fear

10. was the result of his continued failure to follow the orders of the leaders

11. of the leaders of his gang, MS-13. That his failure to follow orders had

12. previously resulted in him being kidnapped of the streets of his town in broad

13. daylight  and beaten by members of his gang, MS-13. A fear further built on

14. the fact, as Defendant testified and told FBI Agen Curtis, was counpunded

15. even more by the fact that he was ordered by MS-13 to kill three people in 3

16. days.  An order that Defendant MENDEZ again failed to follow, further endan-

17. gering his life and the lives of his family.

18.    Defendant MENDEZ expressed repeatedly to the FBI Agents and Riverside

19. Sheriff' s Deputies, that he was in fear for his life should he remain in El-

20. Salvador.  That he was desparate to return to the United States to avoid cer-

21. tain death.  Mr. MENDEZ had already attempted 3 times to escape to the United

22. States, only to be deported back.  In fact, Defendant MENDEZ testified, and

23. Agent Curtis and Investigator Gomez corroborated, that Defendant MENDEZ was

24. so desparate to escape El Salvador and seek refuge in the United States he

25. informed them that he would return illegally to the U.S., if they did not

26. help him return legally very soon.  This was a clear sign of the desperation

27. to escape El Salvador and seek refuge in the United States he informed them

28. that he would return illegally to the U.S., if they did not help him return

Pg. 2

1. Cont'd from page 5 of 11:

2. legally very soon.  This was a clear sign of the desperation to escape.El Sal-

3. vador, that Mr. MENDEZ was operating under.  He was willing to return illegal-

4. ly in order to escape. Making an offer of legal return to the United States

5. that much larger of a benefit and exponentially more desirable.

6.     Agent Curtis indicated that part of his initial "spiel" to deportees he

7. interviewed in the airport in El Salvador, was to inform them  of the two

8. benefits he could provide them should they provide them information.  Those

9. two benefits were: (1) Money if he was a source for the FBI, or (2) travel

10. documents to the United States if he was working with the FBI on unsolved

11. crimes. (RT 71:4-7) These promises and/or inducements were directly in line

12. the great desire Defendant Mendez possessed for legal status in the United

13. States.  These were promises/dinducements stated to Defendant MENDEZ prior to

14. his alleged confession over several interviews and calls with Agent Curtis'

15. interview.

16.     The critical need for Defendant MENDEZ to continue providing this infor-

17. mation to the FBI was evident in the fact, that without Mr. Mendez's coopera-

18. tion and willingness to return to the United States, law enforcement had no

19. reasonable means to prosecute Mr. Mendez.  As Agent Curtis testified,

20.     "Q. But at the same time, had Mr. Mendez decided not to cooperate, he

21.     would have lost this -- the legal document to return the United States

22.     A. That's correct.

23.     Q. And it was important for the FBI -- well, it was -- had Mr. Mendez

24.     not gone through with tht process, you had touched on this idea of extra-

25.     dition process is still quite involved; correct?

26.     A. Correct.

27.     Q. And even then, at that point, for an individual who has given infor-

28.     mation on a homicide, there is no guarantee that extradition would occur;

1. Cont'd from page 5 of 11:

2.      correct?

3.      A. No. And at that time, it probably would not have." (RT. 85-86)

4.      Thus, Mr. Mendez understanding that cooperating with law enforcement was

5. critical to him realizing his desire for refuge in the United States, was a

6. clear point the FBI repeatedly made to Defendant Mendez. It was clear that

7. the FBI made promises in line with Mr. MENDEZ's expressed fear to escape El

8. Salvador, all for the purpose of inducing his allged confession and details in

9. the homicide of Angel Palacios.

10.     B. DEFENDANT'S STATEMENTS TO THE FBI RELATING TO THE HOMICIDE OF

11.        ANGEL PALACIOS WERE THE RESULT AND CAUSED BY THE BY THE PROMISES

12.        OF REFUGE IN THE UNITED STATES BY THE FBI.

13.     "[A] statement is involuntary and inadmissble when the motivating cause

14. of the decision to speak was an express or clearly implied promise of leniency

15. or advantage. [Citation]" (People v. McCurdy  (2014) 59 Cal. 4th 1063, 1088.)

16.     Defendant asserts that knowing this fear, the FBI offered to assist De-

17. fendant in his desire to return to the United States in exchange for infor-

18. mation. The FBI agents told him they could provide him a visa to return to

19. the United States in exchange for information. That Defendant was promised

20. legal status in the United States after providing information to law enforce-

21. ment on the homicide and assistance with remaining in the U.S. after comple-

22. tion of some time in jail and testifying against others in the expected homi-

23. cide trial. Defendant testified at hearing that the reason he provided an

24. alleged confession to the FBI over the span of several interviews, was solely

25. for the fact that he would realize the critical benefit of refuge in the United

26. States, should he do so and cooperate. Mr. MENDEZ was clear in the FBI's posi-

27. tion that unless he provided this information to the FBI and then to law en-

28. forcement in the United States, Mr. Mendez would not realize this promised

1. Cont'd from page 5 of 11:

2. benefit made by Agent Curtis and the FBI

3.     Thus, law enforcement's promise of refuge in the United States, resulted

4. in Defendant Mandez's involuntary statements implicating himself in the homi-

5. cide of Angel Palacios.  As such, Defendant Mendez now requests such statements

6. be excluded as involuntary and the result of promises and inducement.

7.     C. Defendant's Involuntary Confession To FBI Agents Cannot Then Be

8.       Used Against Him In Trial, And Must Be Excluded.

9.     Because the statements by the defendant were involuntarily made, they can-

10. not be used for impeachment or any other purpose by the prosecution at trial.

11. (New Jersey v. Portash, 440 U.S. 450, 459, 99 S. Ct. 1292, 59 L. Ed. 501 (1979);

12. Mincey v. Arizona, 434 U.S. at 1398 ("But any criminal trial use against a de-

13. fendant of his <u>involuntary</u> statement is a denial of due process of Law."

14. [Emphasis in original]).

15.

16. Wherefore, Petitioner prays and respectfully requests that this honorable Court:

17. Issue an order to show cause.

18. Issue an evidentiary hearing.

19. Appoint counsel for this indigent Petitoner, and grant relief to Petitioner in

20. the order of a new trial and grant any other relief this Court deems proper.

21.

22. Date: 04-18-2023                         Respectfully Submitted,

23.

24.                                    Herbert Cornejo Mendez

25.

26.

27.                   Pg. 5

28.

Attachment-D

(a)(1) Supporting FACTS

(Statement of Relevant Facts)

1. From page 5 of 11

2. a.(1)                    <u>STATEMENT OF RELEVANT FACTS</u>

3.      The Court of Appeal Opinion laid out the relevant statement of facts that

4. pertain to the initial trial in this case.  Appellant's Counsel asked of the

5. Reviewing court (Superior court) to incorporate that set of facts in its con-

6. sideration of its hearing.  As well as to incorporate the additional facts

7. that were solicited during the evidentiary hearing before said court.  Below

8. are portions of that testimony, for which the Defense believes are relevant to

9. Reply to People's motion.

10.      In February 2013, FBI Agent Brett Curtis, worked as a Legal Attache in

11. El Salvador.  His duties entailed interviewing identified MS-13 gang members

12. who were deported from the United States to El Salvador.  Mr. Curtis and agents

13. would go to the airport in El Salvador to attempt to speak to this deported MS-

14. 13 indentified individuals. When the FBI agents would ask to interview the peo-

15. ple at the airport as they are waiting to go through the process of entry back

16. in to the country of El Salvador. (RT 6:15-26)

17.      The purpose of this process was, "Intelligence gathering to find out if

18. there were any crimes that they (interviewee) knew about in the US or El Sal-

19. vador - unsolved crimes that they could - they could help us solve."  (RT 9:20-

20. 22)  This activity was beneficial to Agent Curtis' position, as his job was to

21. investigate gang-related crimes as they related to the United States and El

22. Salvador.

23.      Agent Curtis testified that these interviews occurred at El Salvador's

24. International Airport.  50-100 deportees would be brought in by plane and

25. then taken into this large building area, where all the deportees would sit

26. and be fingerprinted.  On this building area was then a couple of offices.

27. (RT 11:1-8)

28.      Agent Curtis testified that he would arrive at this building and provde

1. From page 5 of 11 cont'd:

2. a. (1)

3. the names of individuals he wished to speak to, to the immigration officials

4. in that building.  Then those officials would yell out the individual's name

5. in the group.  Then the FBI Agent Would be waiting in one of the offices for

6. them, and then they would speak to the individual in this office. (RT 11:9-19)

7.      Agent Curtis indicated that this office was open to the general area and

8. had windows, so many times while having sensitive conversations about crimes,

9. other individuals would wander through. (RT 17:22-28)  So there were concerns

10. with talking to an MS-13 individual and having other MS-13 individuals ob-

11. serving this. (RT 18:3-8)

12.      These intelligence meetings were not recorded.  In fact, at the time the

13. FBI police was to not record their interviews in El Salvador. (RT 12:1-11)  In

14. speaking to deportees at the airport in El Salvador, Agent Curtis stated he

15. spoke to them about the possibility of becoming an FBI source was, "...someone

16. that provides information to the -to the FBI about crimes, and they do receive

17. some benefit from doing that.  And so some of the benefits would be pay, or -or

18. if there was value to bringing them back to the United States, we would help

19. them get travel documents so that they could come to the United States and

20. work with the FBI." (14:19-25)  "If they are able to do something in the United

21. States or we determine that --that the information they provide to us or that

22. -- or what they can do in -- to help the FBI, that it would be best for them

23. to go to the United States, then we would go through the process of getting them

24. travel documents so that they could go to the United States.  And then, of course,

25. we would coordinate with the people where they would be sent to so that -- so

26. that they could work with those agents in that area. (RT 15:16-23)  Agent Curtis

27. was responsible for deciding whether an interviewed deportee would be an FBI

28. source. (RT 16:1-2)

Pg. 7

1. Cont'd from page 5 of 11:

2. Thus overshadowing Mr. MENDEZ's rights and his intelligent and voluntary

3. waiver of these critical rights. Mr. MENDEZ knew he needed to speak and these

4. rights under MIRANDA would prevent the promises.  Mr. MENDEZ in essence had

5. no other option but to waive, thus making such a waiver involuntary.  Thus a

6. violation of Defendant's 5th and 14th Amendment rights, and a denial of Due

7. Process.  Such involuntary statements must then be suppressed.

8.

9. Wherefore, Petitioner prays and respectfully requests that this Honorable

10. Court:

11. Issue an order to show cause.

12. Issue an evidentiary hearing.

13. Appoint counsel for this indigent Petitioner, and grant relief to Petitioner

14. in the order of a new trial and grant any other relief this Court deems pro-

15. per.

16.

17. Dated: 04-12-2023                          Respectfully Submitted,

18.

19.

20.                                            Herbert Cornejo Mendez

21.

22.

23.

24.

25.

26.

27.

28.                          Pg. 8

1. From page 5 of 11 cont'd:

2. a.(1)

3.      Conversations with interviewed deportees about becoming an FBI source or

4. the possibility of getting a visa to go back to the United States, would gene-

5. occur during this first initial meeting. (RT17:6-10)
                    (t)
6.      During Agen Curtis' February 22, 2013 interview of Mr. MENDEZ, Agent

7. Curtis was present along with two additional task force officers. (RT 18:13-

8. 15) Agent Curtis was aware that this was at least Mr. Mendez's second time

9. being deported. (RT 23:15-17) Agent Curtis testified that these interviews

10. with Mr. Mendez were conducted in Spanish.  Agent Curtis stated he became

11. fluent in Spanish when he was 19 years old while serving a mission for his

12. church.  Although Agent Curtis did acknowledge that his Spanish was not per-

13. fect and thus would have to ask clarifying questions, or repeat information

14. back to Mr. Mendez to be sure he understood. (RT 21-22)

15.      During this initial interview with Mr. Mendez, Agent Curtis testified he

16. went over with Mr. MENDEZ the process of becoming a FBI source and the pos-

17. sibility of going back to the United States (RT 23:18-22) This initial inter-

18. view lasted 1-2 hours.

19.      Agent Curtis testified, "I told him that I wanted to talk to him, that I

20. knew he was a member of the gang, that I was there to gather information.  If

21. he knew about any crimes in the US or in El Salvador that were - that were un-

22. solved, I wanted to talk to him about that.  I did talk to him about the bene-

23. fits of working with us, that - that we could sign him up as a source if his

24. information was - was worthwhile.  And we did talk about the - the possibility

25. of him going back to the United States and us getting him papers to go back

26. to the United States if he provided information that would warrant that (RT

27. 24:1-24)  As to the ability to get back to the United States on a visa, Agent

28. Curtis testified he explained to Mr. MENDEZ, "...If there is information that

1. From page 5 of 11 cont'd:

2. a.(1)

3. you can provide that will help us in cases over there and there is a purpose

4. for you going back to the United States, we can help you get -- get back to the

5. United States legally." (RT 24:24-28)

6.     While Agent Curtis testified that he did not promise Mr. Mendez anything

7. during this February 22, 2013 interview, he did indicated he did give induce-

8. ments to Mr. Mendez in order to speak to him that day.  Agent Curtis testified

9. he provided the **inducements** he had talked about.  That he said:

10.

11.     "Hey, if you provide information that is worthwhile, we can sign you up
       as a source, and we can pay you.  And if there is any information that
12.     you can provide that would help us in cases in the United States and it
       would be in our benefit to have you go to the United States, we could
13.     help you get back to the United States." (RT 26:17-28)

14.

15.     During a second interview with the FBI, Agent Curtis acknowledges that De-

16. fendant  Mendez is now beginning to express his fear of his gang. MS-13 should

17. remain in El Salvador. "Q. During this interview of March 8th, 2013, does the

18. subject, again, come up of becoming an FBI source and/or getting back to the

19. United States on behalf of Mr. Mendez?  A. So at this point, he is expressing

20. come -- some fear of MS-13 and expressing a desire to get back soon to the Un-

21. ited States." (RT 44)

22.     Agent Curtis would also testify, "Q. You were asked a question on cross --

23. I just want to clarify. I think the question you were asked was "You told Mr.

24. Mendez what you would provide him if he gave you info?"  Is that accurate that

25. you told him you would provide him a benefit if he gave you info? A No. We

26. said -- we said there was a benefit that we could provide depending on what

27. he could do for us.  And so if he worked as a source, we could pay him.  If he

28. could provide information that was relevant to the United States and if they

1. From page 5 of 11 cont'd:

2. a.(1)

3. needed him in the United States, we could help him get back to the United

4. States. (RT 87:18-28)

5.

6.

7.

8.

9.

10.

11.

12.

13.

14.

15.

16.

17.

18.

19.

20.

21.

22.

23.

24.

25.

26.

27.

28.

Pg. 10

Attachment-E
b. Ground Two

1. Cont'd from page 5 of 11:

2.                              GROUND II

3. DEFENDANT'S SUBSEQUENT ALLEGED CONFESSION TO INVESTIGATOR GOMEZ

4. WAS THE RESULT OF THE INVOLUNTARINESS OF HIS STATEMENTS TO THE

5. FBI.  THUS UNDER THE DOCTRINE OF FRUIT OF THE POISONOUS TREE,

6. MR. MENDEZ'S STATEMENTS TO INVESTIGATOR GOMEZ MUST ALSO BE EX-

7. CLUDED.  AS SUCH STATEMENTS CONTINUE TO BE TAINTED BY THE TAIN-

8. TED BY THE INITIAL VIOLTION OF DEFENDANT'S 5TH AND 4TH AMENDMENT

9. RIGHTS, AND SUCH STATEMENTS WERE AS WELL INVOLUNTARY.

10.       Were a statement is alleged to be the tainted fruit of an earlier consti-

11. tutional violation, the defense bears an initial burdent of establishing that

12. the statement was obtained by exploitation of the illegality.  Following such

13. a defense showing, the burden shifts to the prosecution to establish dissipa-

14. tion of any taint. (People v. Beardslee (1991) 53 Cal. 3d 68, 108.)  At hearing

15. Defendant Mendez testified that he was informed repeatedly by Agent Curtis that

16. if he did not repeat the same informaion to law enforcement in the United States,

17. that he provided to the FBI on Angel Palacio's homicide, he would not then real-

18. ize the benefit of the promises of refuge made by Agent Curtis.  So that Mr. Men-

19. dez's subsequent confessions to Investigator Gomez were encompassed in the over-

20. all understanding of Mr. Mendez, that he had to stick to the same story in order

21. to realize the benefits offered to him by Agent Curtis.  thus drenching Mr. Men-

22. dez's statements to Investigator Gomez in the initial involuntary taint of the

23. statements induced by Agent Curtis promises of refuge in the United States.

24.       Any statements obtained from the Mr. MENDEZ after the initial statements

25. were obtained from him in violation of his constitutional rights must be sup-

26. pressed, as they were produced by the earlier illegal and involuntary confession.

27. As stated by the Supreme Court in U.S. v. Bayer (1947) 331 U.S. 532, 540: "Of

28. course, after an accused has let the cat out of the bag by confession, no matter

1. Cont'd from page 5 of 11:

2. what inducement, he is never thereafter free of the psychological and practical

3. disadvantages of having confessed.  He can never get the cat back in the bag.

4. The cret is out for good.  In such a sense, a later confession always may be look-

5. ed upon as fruit of the first."

6.        This taint from the involuntary statements to Agent Curtis is evident in Mr.

7. MENDEZ"S subsequent statements to Investigator Gomez both over his March 14th In-

8. terview and May 16th Interview.  In both interviews it is mentioned that the FBI

9. will be working to assist Mr. Mendez to return to the United States.  In fact in

10. his may 16th interview, Mr. MENDEZ even states to Investigator Gomez, "I'm going

11. to be here like that, well because Brett also told me that he was also going to

12. be able to help me stay here, but afterwards he tells me not anymore.  That he

13. can't do anything."  (5/16 Intrv TX pg. 58)  Investigator Gomez would go on to

14. himself acknowledge the no-win situaion Defendant MENDEZ found himself in when

15. providing the alleged confession.

16.            "I: I mean, you're in El Salvador with, with, fears you know, how

17.            do you say the word, the chances that they were going to kill you,

18.            or come to the united States and take the chance of going to jail?

19.            D. Ahum.

20.            I: Or come here to jail.

21.            D: Ahum."

22.            (5/16 Intrv TX Pg. 46)

23.        Thus, for Mr. Mendez, there was no attenuation from his initail statements

24. to Agent Curtis and his subsequent statements to Inv. Gomez.  They were all one

25. and the same line of thought.  This was the same story from beginning to end, with

26. the benefit remaining of refude in the United States.  Thus, these subsequent

27. statements are also involuntary and must be excluded.

28.     A. While Defendant Is Claimed to Have Waived His Rights under Miranda,

Pg. 12.

1. Cont'd from page 5 of 11:

2.        **Defendant Argues That This Waiver was Not Knowingly And Intel-**

3.        **ligently Made.  Nor Voluntarily Done.**

4.   "To meet its burden, the State must affirmatively prove not only that the

5. waiver was voluntary, but also that it constituted "a knowing and intelligent

6. relinquishment or abandonment of a known right or privilege." (Edwards v. Ari-

7. zona (1981) 451 U.S. 477, 482, citing Johnson v. Zerst (1938) 304 U.S. 458.

8. 464.)

9.   Defendant's waiver of Miranda with Investigator Gomez  cannot be said to

10. be voluntary, as it was made clear to Mr. MENDEZ that he only realized the be-

11. nefit of the promises and inducements from the FBI if he provided the same in-

12. formation.  Thus overshadowing Mr. MENDEZ's rights and his intelligent and

13. voluntary waiver of these critical rights.  Mr. MENDEZ knew he needed to speak

14. and these rights under MIRANDA would prevent the promises.  Mr. MENDEZ in es-

15. sence had no other option but to waive, thus making such a waiver involuntary.

16. Thus a violation of Defendan's 5th and 14th Amendment rights, and a denial of

17. Due Process.  Such involuntary statements must then be suppressed.

18. Wherefore, Petitioner prays and respectfully requests that this honorable

19. Court:

20. Issue an order to show cause.

21. Issue an evidentiary hearing.

22. Appoint counsel for this indigent Petitioner, and grant relief to Petitioner

23. in the order of a new trial and grant any other relief this Court deems pro-

24. per.

25.

26. Date: _04-12-2023_                   Respectfully Submitted,

27.

28.                                             Herbert Cornejo Mendez

Pg. 13

_____

_____

_____

(2) Did you raise this claim on direct appeal to the California Court of Appeal?    ☒ Yes    ☐ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?    ☒ Yes    ☐ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?    ☐ Yes    ☒ No

c.   Ground three: _____

(1) Supporting FACTS: _____

_____

_____

_____

(2) Did you raise this claim on direct appeal to the California Court of Appeal?    ☐ Yes    ☐ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?    ☐ Yes    ☐ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?    ☐ Yes    ☐ No

d.   Ground four: _____

(1) Supporting FACTS: _____

_____

_____

_____

(2) Did you raise this claim on direct appeal to the California Court of Appeal?    ☐ Yes    ☐ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?    ☐ Yes    ☐ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?    ☐ Yes    ☐ No

e.   Ground five: _____

(1) Supporting FACTS: _____

_____

_____

_____

(2) Did you raise this claim on direct appeal to the California Court of Appeal?    ☐ Yes    ☐ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?    ☐ Yes    ☐ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?    ☐ Yes    ☐ No

9.   If any of the grounds listed in paragraph 8 were not previously presented to the California Supreme Court, state briefly which grounds were not presented, and give your reasons: _____ N/A _____

_____

_____

10.  Have you previously filed any habeas petitions in any federal court with respect to this judgment of conviction?

☐ Yes    ☐ No

If so, give the following information for each such petition *(use additional pages, if necessary, and attach copies of the petitions and the rulings on the petitions if available)*:

a.   (1) Name of court: _____ N/A _____

(2) Case number: _____

(3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

(4) Grounds raised *(list each)*:

(a) _____ N/A _____

(b) _____

(c) _____

(d) _____

(e) _____

(f) _____

(5) Date of decision: _____

(6) Result _____

_____

· (7) Was an evidentiary hearing held?    ☐ Yes ☐ No

b.   (1) Name of court: _____ N/A _____

(2) Case number: _____

(3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

(4) Grounds raised *(list each)*:

(a) _____ N/A _____

(b) _____

(c) _____

(d) _____

(e) _____

(f) _____

(5) Date of decision: _____

(6) Result _____ N/A _____

(7) Was an evidentiary hearing held?    ☐ Yes  ☒ No

11. Do you have any petitions now pending (i.e., filed but not yet decided) in any state or federal court with respect to this judgment of conviction?        ☐ Yes    ☒ No

If so, give the following information *(and attach a copy of the petition if available)*:

(1) Name of court: _____

(2) Case number: _____

(3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

(4) Grounds raised *(list each)*:

(a) _____

(b) _____

(c) _____

(d) _____

(e) _____

(f) _____

12. Are you presently represented by counsel?    ☐ Yes  ☒ No

If so, provide name, address and telephone number: _____

_____

_____

WHEREFORE, petitioner prays that the Court grant petitioner all relief to which he may be entitled in this proceeding.

_____
*Signature of Attorney (if any)*

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on  4 - 12 - 2023 _____
             *Date*                              *Signature of Petitioner*

PROOF OF SERVICE BY MAIL

BY PERSON IN STATE CUSTODY

(Fed. R. Civ. Proc. 5; 28 U.S.C. § 1746)

I. Herbert Cornejo Mendez, Declare: I am over eighteen (18) years of age and am a party to this action.  I am a resident of Pelican Bay State Prison, in the  County of Del Norte, State of California. My State Prison address is: Pelican Bay State Prison, P.O. Box 7500, Housing Unit Delta 9-102 - Cell Number 202, Crescent City, CA. 95532-7500.

On the  04 - 18 day of  2023            , I served the following document(s): Habeas Corpus, 1 Original, 2 Copies  of Petitioner's Habeas Peti-tion - Court of Appeal decision - Petition For Review, 3 Copies
On the parties herein by placing true and correct copies thereof, en-closed in a sealed envilope, with postage thereon fully paid, in the United States Mail in a receptacle so provided at Pelican Bay State Prison, Crescent City, CA. 95532, and addressed as follows:

Clerk of the United State District Court
for the Central District of California
Intake/Docket Section
255 East Temple Street, Suite TS-134
Los Angeles, California 90012

I declare under penalty of perjury that the foregoing is true and Correct.

Inmate Signature                                                              04-12-2023
                                                                                              Date

Pg. 12

Attachment-F

(Petition for Review)

SUPREME COURT NO.

## IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

THE PEOPLE OF THE STATE OF
CALIFORNIA,
Plaintiff and Respondent,

vs.

HERBERT CORNEJO MENDEZ,
Defendant and Appellant.

Court of Appeal
No. D078710

Superior Court No.
INF1301168

## APPEAL FROM THE SUPERIOR COURT OF
## RIVERSIDE COUNTY

Honorable James S. Hawkins, Judge

## APPELLANT'S PETITION FOR REVIEW

Patricia L. Brisbois
State Bar No. 167180
P.O. Box 518
Tualatin, OR 97062
(503) 680-8683
E-mail: brisbois167180@gmail.com
By appointment of the Court of Appeal
For Herbert Cornejo Mendez

## TOPICAL INDEX

                                                                    PAGE

PETITION FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

ISSUE PRESENTED FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

NECESSITY OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

STATEMENT OF THE UNDERLYING PROCEEDINGS . . . . . . . . . . . . . . .7

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

I    REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER
     APPELLANT'S STATEMENTS TO SPECIAL AGENT CURTIS
     WERE INVOLUNTARY BY VIRTUE OF BEING INDUCED BY
     AN IMPLIED PROMISE OF A SIGNIFICANT ADVANTAGE. . . . . . 9

     A.    Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

     B     The Evidentiary Hearing . . . . . . . . . . . . . . . . . . . . . . . . . .9

     C.    The Trial Court's Ruling. . . . . . . . . . . . . . . . . . . . . . . . . 19

     D.    The Voluntariness of a Confession is Determined By Considering
           the Totality of the Circumstances. . . . . . . . . . . . . . . . . . .20

     E.    The Court's Finding No Implied Promise of a Significant
           Advantage Had Been Made to Appellant is not Supported by
           Substantial Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

CERTIFICATION OF WORD COUNT . . . . . . . . . . . . . . . . . . . . . . . . . 30

EXHIBIT "A" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31

2

## TABLE OF AUTHORITIES

**CASES**                                                         **PAGE(S)**

*Arizona v. Fulminante* (1991) 499 U.S. 279
                    [111 S.Ct. 1246, 113 L.Ed.2d 302] . . . . . . . . . . 24-25, 29

*Beckwith v. United States* (1976) 425 U.S. 341
                    [ 96 S.Ct. 1612, 48 L.Ed.2d 1] . . . . . . . . . . . . . . . . . . . . . 22

*Bram v. United States* (1897) 168 U.S. 532
                    [18 S.Ct. 183. 42 L.Ed. 568] . . . . . . . . . . . . . . . . . . . . . .24

*Colorado v. Connelly* (1986) 479 U.S. 157
                    [107 S.Ct. 515, 93 L.Ed.2d 473] . . . . . . . . . . . . . . . . . 28

*Cooper v. Dupnik* (9th Cir. 1992) 963 F.2d 1220. . . . . . . . . . . . . . . . . 28

*Harrison v. United States* (1968) 392 U.S. 219
                    [88 S.Ct. 2008, 20 L.Ed.2d 1047] . . . . . . . . . . . . . . . 29

*In re Shawn D.* (1993) 20 Cal.App.4th 200. . . . . . . . . . . . . . . . . . . . . . .24

*Jackson v. Denno* (1964) 378 U.S. 368
                    [84 S.Ct. 1774, 12 L.Ed.2d 908] . . . . . . . . . . . . . . . . .28

*Leyra v. Denno* (2954) 347 U.S. 556
                    [74 S.Ct. 716, 98 L.Ed.2d 948] . . . . . . . . . . . . . . . . 28-29

*Lujan v. Garcia* (9th Cir. 2013) 734 F.3d 917 . . . . . . . . . . . . . . . . . . . . . 29

*Mincey v. Arizona* (1978) 437 U.S. 385
                    [98 S.Ct. 2408, 57 L.Ed.2d 290] . . . . . . . . . . . . . . . . .28

*People v. Adams* (1983) 143 Cal.App.3d 970. . . . . . . . . . . . . . . . . . . . . .29

*People v. Beardslee* (1991) 53 Cal.3d 68. . . . . . . . . . . . . . . . . . . . . . . . . 28

*People v. Boyde* (1988) 46 Cal.3d 212 . . . . . . . . . . . . . . . . . . . . . . . . . . .24

*People v. Cahill* (1993) 5 Cal.4th 478 . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*People v. Carrington* (2009) 47 Cal.4th 145. . . . . . . . . . . . . . . . . . . . . . .21

*People v. Cooper* (1991) 53 Cal.3d 771. . . . . . . . . . . . . . . . . . . . . . . . . . 27

## TABLE OF AUTHORITIES (Continued)

**CASES (Continued)**                  **PAGE(S)**

*People v. Hill* (1992) 3 Cal.4th 959 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*People v. Hogan* (1982) 31 Cal.3d 815 . . . . . . . . . . . . . . . . . . . . . . . . . . .27

*People v. Hoyt* (2020) 8 Cal.5th 892. . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*People v. Jiminez* (1978) 21 Cal.3d 595 . . . . . . . . . . . . . . . . . . . . . . 25-26, 28

*People v. Linton* (2013) 56 Cal.4th 1146. . . . . . . . . . . . . . . . . . . . 20-21, 26

*People v. Mendez* (Aug. 22, 2018, D073443)

         [2018 Cal.App.Unpub.LEXIS 5704] [nonpub. opn.] . . . .7-8

*People v. Neal* (2003) 31 Cal.4th 63 . . . . . . . . . . . . . . . . . . . . . . . . . . .28

*People v. Thompson* (1990) 50 Cal.3d 134. . . . . . . . . . . . . . . . . . . . . . . . 20

*People v. Williams* (1997) 16 Cal.4th 635. . . . . . . . . . . . . . . . . . . . . . . .20

*United States v. Okwumabua* (2d Cir. 1987) 828 F.2d 950 . . . . . . . . . . . . . . 27

*Withrow v. Williams* (1993) 507 U.S. 680

         [113 S.Ct. 1745, 123 L.Ed.2d 407] . . . . . . . . . . . . . . . .20

*Wong Sun v. United States* (1963) 371 U.S. 476

         [83 S.Ct. 407, 9 L.Ed.2d 441] . . . . . . . . . . . . . . . . . . . .28

**CONSTITUTION**

    U.S. Const., 5th Amend. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    U.S. Const., 14th Amend. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**STATUTES**

    Penal Code

         section 187, subdivision (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

         section 190.2, subdivision (a)(15). . . . . . . . . . . . . . . . . . . . . . . . 7

         section 12022, subdivision (b)(1) . . . . . . . . . . . . . . . . . . . . . . . . 7

**CALIFORNIA RULES OF COURT**

    Rule 8.500(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

SUPREME COURT NO.

## IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

THE PEOPLE OF THE STATE OF
CALIFORNIA,
Plaintiff and Respondent,

vs.

HERBERT CORNEJO MENDEZ,
Defendant and Appellant.

Court of Appeal
No. D078710

Superior Court No.
INF1301168

### APPEAL FROM THE SUPERIOR COURT OF
### RIVERSIDE COUNTY

Honorable James S. Hawkins, Judge

---

### PETITION FOR REVIEW

---

TO THE HONORABLE TANI CANTIL-SAKAUYE, CHIEF
JUSTICE, AND TO THE HONORABLE ASSOCIATE JUSTICES OF THE
SUPREME COURT OF THE STATE OF CALIFORNIA:

HERBERT CORNEJO MENDEZ, defendant and appellant,
respectfully petitions for review following the unpublished decision of the Court
of Appeal, Fourth Appellate District, Division One, filed on July 7, 2022,
affirming the judgment. A copy of the Court of Appeal's opinion is attached to
this petition as Exhibit "A." Appellant requests that this court grant his petition.

## ISSUE PRESENTED FOR REVIEW

Appellant presents the following issues for a grant of review under rule 8.500(b)(1) of the California Rules of Court:

1.     Were appellant's statements to a special agent in El Salvador about a murder committed in the United States coerced and rendered involuntary based on an implied promise of a significant advantage that he could return lawfully to the United States and live there freely after testifying, and was the court's conclusion to contrary supported by the totality of the circumstances?

## NECESSITY OF REVIEW

Review of the issues presented is necessary to secure uniformity of decision and to settle important questions of law pursuant to California Rules of Court, rule 8.500(b)(1).

After being deported to El Salvador, appellant Herbert Cornejo Mendez made statements about his and others' involvement in a gang-related murder in the United States to Special Agent Curtis. Those statements were involuntary and the trial court's conclusion to the contrary is not supported by substantial evidence. The agent induced appellant into confessing by exploiting his fear of MS-13 and making an implied promise of a significant advantage. The implied promise was that, if appellant gave information linking himself to a crime committed by MS-13 in the United States, the agent would be able to get him travel documents to return to the United States legally and to live there freely in exchange for his testimony after doing only a little jail time.

Review should be granted to determine whether the agent made an implied promise of an advantage and significant benefit that was motivated

6

appellant to confess to being involved in a murder and whether his statements were involuntary and inadmissible as a matter of law

## STATEMENT OF THE UNDERLYING PROCEEDINGS

In 2014, the People filed an information charging appellant with one count of murder along with a special circumstance allegation for lying in wait and an enhancement allegation for personally using a deadly weapon (Pen. Code, §§ 187, subd. (a), 190.2, subd. (a)(15), 12022, subd. (b)(1)). (Supplemental Clerk's Transcript (SCT) 4-5.) In March 2016, he was found guilty of first degree murder and the jury also found the weapon use and special circumstance allegations to be true. (SCT 6.; D073443 Vol. 6 Reporter's Transcript 1068.) In June 2016, he was sentenced to a term of life without the possibility of parole. (SCT 10-11; D073443 Vol. 6 Reporter's Transcript 1075, 1080.)

Appellant filed an appeal, and on August 22, 2018, in an unpublished decision, the Court of Appeal conditionally reversed the judgment and remanded the case for an evidentiary hearing on the voluntariness of appellant's confessions. (See *People v. Mendez* (Aug. 22, 2018, D073443) [2018 Cal.App.Unpub.LEXIS 5704 at p.*20] [nonpub. opn.].)[1]

The evidentiary hearing took place over several months, with witness testimony heard on November 17, 2020, and January 14 and 19 and February 24, 2021. (Clerk's Transcript (CT) 26, 39, 41, 184.) On February 24, 2021, the court heard arguments regarding the voluntariness of appellant's confession and found the confession had not been induced by promises and appellant's free will had not been overborne. (CT 184-185; Vol. 2 Reporter's Transcript (2RT) 391,400-401.) The judgment of conviction was reinstated, and on March 9, 2021, appellant filed a notice of appeal. (CT 200.)

---

[1]      In an order issued on June 4, 2021, the court granted judicial notice of its prior opinion.

On July 7, 2022, the Court of Appeal, in an unpublished decision, affirmed the judgment. (Exh. A, Opn.)  This timely petition for review follows.

## STATEMENT OF FACTS

In September 2005, the body of Angel Palacios was discovered in the desert near I-10; it was determined he died from "multiple sharp force trauma." (*People v. Mendez, supra,* 2018 Cal.App.Unpub.LEXIS 5704 at pp.*2-3.)  The case eventually went cold.  (*Id.* at p. *3.)

In 2013, after being deported, appellant spoke with FBI Special Agent Bret Curtis at an airport in El Salvador in an unrecorded interview.  (*People v. Mendez, supra,* 2018 Cal.App.Unpub.LEXIS 5704 at pp. *3-4.)  Curtis told appellant he could work for the FBI as an informant in exchange for money; Curtis also said he could get appellant a visa to return to the United States to testify as a witness if he had been present for crimes that ended up being prosecuted there. (*Id.* at p. *4.)  Appellant expressed fear of MS-13 and of remaining in El Salvador based on his past experiences with the gang and he ended up telling Curtis he had been involved in the Palacios murder in order to go back to the United States legally.  (*Id.* at pp. *4-5.)

Curtis confirmed with Riverside Sheriff's Investigator Nelson Gomez that Palacios had been killed; Gomez interviewed appellant over Skype, and then Curtis helped appellant obtain a passport and arranged for other travel documents for him to return to the United States. (*People v. Mendez, supra,* 2018 Cal.App.Unpub.LEXIS 5704 at pp. *5-6.)  Appellant was arrested upon his return and subsequently tried and convicted of Palacios' murder.  (*Id.* at p. *6.)

8

## ARGUMENT

### I

### REVIEW SHOULD BE GRANTED TO DETERMINE WHETHER APPELLANT'S STATEMENTS TO SPECIAL AGENT CURTIS WERE INVOLUNTARY BY VIRTUE OF BEING INDUCED BY AN IMPLIED PROMISE OF A SIGNIFICANT ADVANTAGE.

A.     **Summary of Argument.**

Following the evidentiary hearing held on remand to determine whether appellant Herbert Cornejo Mendez's statements to Special Agent Curtis at the airport in El Salvador were voluntary or involuntary, the trial court concluded the statements were voluntarily made and appellant's will was not overborne. (2RT 390-391, 400.) The Court of Appeal agreed and affirmed the trial court's ruling. (Exh. A, Opn. 22-30.)

Appellant disagrees. The totality of the circumstances show his statements were involuntary because Curtis induced him into confessing by making an implied promise of a significant advantage—that if he gave information linking himself to a crime committed by MS-13 in the United States, the agent would be able to get him travel documents that would allow appellant to return to the United States legally and to live there freely in exchange for his witness testimony after doing only a little jail time. The trial court concluded no implied promises had been made, but in considering the totality of the circumstances, the record is to the contrary. Appellant therefore urges this court to grant review.

B.     **The Evidentiary Hearing.**

In February 2013, FBI Special Agent Bret Curtis worked as an assistant legal attaché in El Salvador. (Vol. 1 Reporter's Transcript (1RT) 16-17.) Part of his job was to gain intelligence about gangs, primarily MS-13 and 18th Street, and he worked with El Salvadoran police in doing so. (1RT 17-18.) As part of this effort, they would review the roster of deportees being returned from

9

the United States to El Salvador and check those names in a database to see if anyone was a known gang member. (1RT 18, 20-21.) They would meet such identified individuals at the airport and interview them as part of the process for returning to their native country. (1RT 18.) Curtis explained he would be given information explaining why a particular deportee was believed to be a member of a gang, i.e., MS-13, as well as the person's criminal or arrest history, and that it was not usual to receive information that an individual was considered a suspect in a crime. (1RT 21.) The agent's overall purpose was to gather intelligence about unsolved crimes committed in the United States or El Salvador. (1RT 21.)

Curtis would talk with the subject of the interview about becoming a source for the FBI and he would explain the benefits that could flow from being a source. (1RT 26.) Those benefits could involve being paid for information or, if the information was of particular value to either a state or federal investigation, being brought back to the United States and being given travel documents to accomplish that. (1RT 26-27.) For the latter to occur, Curtis would have to contact agents in the United States to look up information to see if it was valuable first. (1RT 28.) If it was, Curtis would request the deportee be given a significant benefit parole status visa. (1RT 28-29.) Conversations about these benefits would occur during the first interview. (1RT 29.)

On February 22, 2013, appellant was deported for a third time from the United States to El Salvador and Agent Curtis went to the airport with a couple of El Salvadoran anti-gang task force officers to talk with him. (1RT 18-19, 32.) The interview was not recorded. (1RT 23-24.) Curtis was present with two other El Salvadoran task force officers; they interviewed appellant in Spanish in a small room but he was not handcuffed and not suspected of any specific crimes. (1RT 30-34, 76-77.) The interview lasted between one to two hours. (1RT 35.)

Curtis told appellant they knew he was a gang member, they were gathering information, and wanted to know if he knew of any unsolved crimes in

10

El Salvador or in the United States. (1RT 35-36, 104.) Curtis explained the benefits of working with the FBI as a source, that it might be possible for appellant to go back to the United States and to get him legal documents for that if he had information that would help with any cases in the United States. (1RT 36, 38, 49, 82-84.) Curtis denied making any promises to appellant.[2] (1RT 37-38, 47-48, 87, 102.)

Appellant expressed a desire to return to the United States and he told Curtis his sister had mentioned the witness protection program, but Curtis could not recall at what point in the conversation this was mentioned; Curtis told appellant he would look into it. (1RT 39-40, 86.) Curtis twice stated he could not recall if appellant expressed fear for his safety in El Salvador during this first interview. (1RT 49, 86-87.) When asked a third time, Curtis testified, "He never expressed during that first interview, *that I remember*, that he - - his life was in danger because he was returned to El Salvador." (1RT 102, italics added.) At some point, appellant provided information about five homicides—three in El Salvador and two in the United States. (1RT 40-41.) Curtis could not recall the order in which appellant told him about these murders. (1RT 41.)

With regard to the two murders in the United States, appellant said he discarded the murder weapons in a Los Angeles homicide and Curtis thought he might be able to be a witness because the victim had been an amputee and appellant could describe the vehicle. (1RT 51.) But Curtis had greater interest in a homicide appellant said he had helped commit. (1RT 51.)

At the end of the first interview, Curtis told appellant he would look into the crimes to find out if the information provided was valid and they exchanged phone numbers. (1RT 52, 87.) Curtis testified he did not tell appellant he would be a source or that he would get him a visa to go back to the United

---

[2]    Curtis wrote a report of the interview that was provided to the prosecutor and defense counsel, but it was heavily redacted and not offered as evidence at the hearing. (1RT 38.)

11

States, but only that it was a possibility. (1RT 52, 100.) They agreed to have a follow-up interview. (1RT 53.)

Curtis did further research into the Palacios murder near Indio by calling the county coroner; he was eventually put in touch with Investigator Gomez. (1RT 53.) Gomez sent Curtis photos of Palacios and others appellant had named along with a summary of the murder investigation. (1RT 54-55.)

During a second interview, appellant expressed again fear of MS-13 because he had not checked in with the gang; appellant desired to return to the United States, and he was able to identify photos of the victim Palacios and the person who directed the killing—Mauricio Aguilar (Chorombo). (1RT 56, 89-91.) Curtis told appellant he would look into the prospect of returning him to the United States. (1RT 57, 89-90.) Appellant provided details of Palacios' murder, and Curtis told appellant he would give the information appellant had provided to Investigator Gomez for verification and that he would find out what law enforcement in the United States wanted to do; they spoke about appellant testifying against Chorombo and the others involved in the Palacios homicide and about getting appellant back to be a witness in the United States. (1RT 58-59, 90.)

On March 14, 2013, Curtis took appellant to a hotel where an interview was conducted by Investigator Gomez via Skype. (1RT 59.) In advance of that session, Curtis was aware Gomez planned to get a warrant for appellant's arrest. (1RT 60.) Curtis had been advised by the Department of Justice that he needed to tell appellant he would be arrested upon his return to the United States and he did that before the interview. (1RT 60-61, 94.) Curtis told appellant he would be speaking with Gomez about the information he had already given to Curtis. (1RT 92-93.)

Curtis was working to obtain a significant benefit parole visa for appellant. (1RT 60.) He was not sure at what point he had discussed this visa with appellant or if he had gone into any detail about it. (1RT 60.) When

appellant asked if he would be able to stay in the United States once released from jail, Curtis told him it would depend on what assistance he was able to provide to law enforcement authorities in California. (1RT 62, 94, 98.) Curtis was not certain when this conversation took place but was certain they discussed it on March 14th and that they had "multiple conversations." (1RT 62.) Curtis also told appellant he did not know how much jail time appellant would have to do. (1RT 94.)

After the Skype interview with Gomez, Curtis immediately took appellant to the immigration office to obtain a passport and Curtis paid the fee for that. (1RT 64-65.) Eventually a significant benefit parole visa was obtained as well, but that took more time because Curtis needed to wait for the arrest warrant. (1RT 64-65.) Curtis lacked authority to arrest appellant in El Salvador and there was no extradition treaty, so he could not be extradited. (1RT 66.)

On April 18, 2013, appellant told Curtis he was fearful, his life was in danger, that could no longer stay at his sister's home, and that he planned to return to the United States illegally soon; as a result, Curtis put him up in a hotel for a month and gave him money for food. (1RT 57, 67, 95-96) Curtis told appellant they were still waiting for the paperwork so he could return to the United States. (1RT 67.)

On May 16, 2013, Curtis and two other officers took appellant to the airport; once there, Curtis gave appellant his passport and other travel documents. (1RT 68-70, 96.) Once appellant cleared the immigration line they rejoined him; two officers accompanied appellant for the duration of the flight to the United States. (1RT 68-70.) Appellant was arrested when he landed. (1RT 71-72.)

Appellant was born in El Salvador in 1983 and did not have a very stable upbringing; he only completed the seventh grade and never got good grades. (1RT 147-150.) He eventually joined MS-13 as a teen so the gang would stop beating him up and to avoid being killed. (1RT 150-152, 197.) He was picked up

a few times by El Salvadoran police as part of the Mano Dura program against
gangs for illegal association and he had gotten gang-related tattoos as a youth.
(1RT 153-154, 199.)

Appellant illegally entered the United States for the first time at age
21 and was deported less than two years later. (1RT 155, 157, 200-201.) The
gang contacted him in the United States because his cousin is a gang member, and
he sold drugs with them in North Hollywood; after he was deported from Texas in
2006, the gang kidnapped him and beat him up in El Salvador for failing to check
in. (1RT 157-158, 163, 202-203, 204.) The gang told him he had to kill three
people in 13 days or they would kill him. (1RT 163-164, 222.) Because he did
not comply with this order, appellant feared for his life. (1RT 164.) He illegally
reentered the United States in 2006 in an effort to escape the gang, and he was
later deported a second time. (1RT 161-162.) He illegally reentered the United
States in 2011 and was deported a third time in 2013; that was the time he met
Agent Curtis. (1RT 162-163.)

The second and third times he entered the country illegally, appellant
lived in Texas; he had first gone to Texas in November 2005 to get away from the
gang. (1RT 204-207, 213-215.) Appellant had sought asylum previously and
spent several months in federal prison for illegal entry, but he had no way to prove
the gang had threatened his life so he could not be given asylum. (1RT 215-
216;2RT 257-258.) Appellant understood Palacios had been killed in September
2005. (1RT 205.) For roughly seven years, while living in Texas, appellant had
no contact with the gang. (1RT 221; 2RT 262.) He left California in 2005
because he had been using drugs and the gang threatened to kill him. (2RT 260.)

Appellant believed speaking with Curtis and the El Salvadoran
officers was part of the process for coming back to El Salvador. (1RT 164-165.)
Curtis told appellant he knew he was a gang member, he explained the program
the FBI had for dealing with victims and witnesses from El Salvador and asked if

14

appellant had any information that would help them solve crimes in the United
States or El Salvador. (1RT 166-167.)   Curtis also showed appellant paperwork
of his deportations. (1RT 227.)  When Curtis said he could pay appellant for
information, appellant told him money would not help him because he would be
killed in El Salvador. (1RT 167.)  Curtis then told appellant if he had information
about crimes committed in the United States, he could bring him back there as a
witness and get him a visa and other papers to return legally. (1RT 167-170.)
This was important to appellant because he knew the gang was looking to kill him
in El Salvador. (1RT 169.)

Appellant told Curtis about a homicide in Los Angeles that he had
heard about but had not participated in. (1RT 170-171.)  Appellant said he had
only helped get rid of knives used in that crime. (1RT 231-232.)  Curtis told
appellant that was not enough for a visa, that he either had to be a participant in a
crime or he had to have been there when the crime had been committed. (1RT
171.)  Curtis told appellant if the information he provided led to an arrest or helped
solve a crime, they would be able to bring him to the United States as a witness.
(1RT 235-236.)  Appellant told Curtis about the Palacios murder and gave names
of the people involved, including the person who had given the order to kill
Palacios. (1RT 174.)  Appellant told Curtis he had been involved as well even
though this was not true; appellant lied because he wanted to get out of El
Salvador and he understood he had to provide this kind of information in order to
get a visa. (1RT 175-176.)  Appellant testified he actually learned about the
murder from other gang members in El Salvador. (1RT 176.)  He also testified
Curtis told him he would be coming to the United States as a witness. (1RT 176-
177.)  Appellant was desperate to get back to the United States to avoid being
killed by MS-13. (2RT 256.)

Curtis told appellant he needed to verify the information appellant
had given him and that if the crimes had actually happened, he could sign

15

appellant up as a witness. (1RT 177.)  Then Curtis set up a second interview, and they stayed in touch by phone. (1RT 178.)  In phone calls, they discussed the dangers to appellant in El Salvador and the status of the visa. (1RT 178.) Appellant told Curtis that, in case they could not help him, he planned to go to Guatemala to make arrangements for returning illegally to the United States because he could not remain in El Salvador. (1RT 179.)  Curtis tried to dissuade appellant and asked why risk going by illegal means if he could return legally. (1RT 179.)  Appellant got in touch with Curtis when he returned from Guatemala. (1RT 179-180.)  At some point between interviews, appellant had gotten a new tattoo ,"503," which was the country code for El Salvador. (2RT 266-267.)

    A second interview took place at a police station, and appellant provided more details about the Palacios murder and identified people in some photographs. (1RT 180-181, 183.)  Curtis told appellant that because of the recession, the government was closing safe houses and if he came back to the United States there was a chance he could be arrested. (1RT 182, 238.)  Curtis also asked for the address of a relative where he could find appellant. (1RT 182.) Curtis said if appellant stayed in the United States with a relative, he would be visited every few weeks or once a month by an officer to make sure of his location and that he was not using drugs. (1RT 182-183.)  Appellant was told there would be a follow-up third interview that he understood was a part of the process for getting a visa. (1RT 183.)  Whenever appellant spoke with Curtis between interviews, he always asked about the visa and Curtis told him things were going well and not to worry. (1RT 183-184.)

    For the third interview, Curtis told appellant to just talk about what he had said before; appellant understood this was part of the process for getting the visa so that he could return to the United States legally. (1RT 184; 2RT 265.) Appellant spoke with Investigator Gomez over Skype and gave him the details about the Palacios murder; appellant said he had been involved, even though this

16

was not true. (1RT 184-185, 187.) Appellant also told Gomez about his trouble with MS-13 and that his life was in danger if he remained in El Salvador. (1RT 187.) After the interview Curtis took appellant to get a passport. (1RT 189-190.) Curtis also paid for appellant to stay in a hotel because his family was afraid if he continued to stay with them because appellant had agreed to be a witness against MS-13. (1RT 190.)

Based on what Curtis had told him, appellant believed that after he testified, he would be free and allowed to remain in the United States. (1RT 190, 193.) Both Curtis and Gomez told appellant he might have to do some jail time, but he did not know he would be arrested once the plane landed. (1RT 242-243.) Curtis told appellant he could be arrested, but the recession was almost over and then he would be placed in a safe house. (2RT 264.) Curtis kept the passport and other documents until the time of the flight; two officers accompanied appellant on the flight. (1RT 191, 193.) Curtis told appellant that he would have to repeat the same story he had already given once he arrived in the United States. (1RT 192.) Appellant understood there was a chance he would be put in jail, but he was never told he would be charged with murder or that he would face spending the rest of his life in prison. (1RT 192-193.)

In the first interview held over Skype, appellant told Investigator Gomez the details of Palacios murder and how it related to the other murder appellant had disclosed to Curtis. (CT 45-48, 53-91.) Appellant said he wanted to leave El Salvador because the gang would kill him since he was no longer with MS-13. (CT 96-97.) Gomez said he understood appellant's reasons for wanting to return to the United States, that he was speaking with the FBI and the district attorney to see what they could do, but he could not make any promises or guarantees. (CT 104, 106.) Appellant asked if he would have to pay with jail time, and Gomez asked appellant if he understood there was a chance that could happen, but said it helped that appellant admitted his role in the murder. (CT 112.)

17

Gomez told appellant he had spoken with Curtis, that Curtis said he could do something to get the papers needed for appellant to return to the United States, but that Gomez needed more time to see what he could do. (CT 115.) Appellant asked about jail time again, and Gomez said it would depend on whether appellant could keep helping them, but he could not say yes or no as to any jail time. (CT 116.) Before the conversation ended, appellant asked about jail time once more and again Gomez said he had to talk to the district attorney; he also asked if appellant was saying he wanted to make himself a witness, and appellant said yes. (CT 119.)

At the end of the call Curtis told Gomez "we're working on getting [appellant] parole papers so he can get a (visa). He's lost his passport but he's gonna look for his passport and see if we can get him some traveling papers to get over there." (CT 120-121.) Before ending the call, Curtis told Gomez "I'll move forward on getting him papers so he can travel." (CT 121.)

After appellant returned to the United States and was arrested, Gomez interviewed him again and appellant went over the details of Palacios murder once more. (CT 122, 127-169.) Toward the end, Gomez asked appellant if he would be willing to testify against Krusty, one of the other participants in Palacios' murder. (CT 175.) Appellant said that was why he had been brought there (to the United States), so yes, he was willing to do that. (CT 175.)

At the evidentiary hearing, Gomez testified it was his understanding no promises had been made to appellant, that the initial interview with Curtis had been to debrief appellant as to what he knew about MS-13. (2RT 286.) Gomez set up the Skype interview so he could hear firsthand the information appellant had. (2RT 290.) Gomez reiterated he had not made any promises to appellant in their interviews. (2RT 291-292.)

Gomez testified appellant said his life was in danger, he had issues with MS-13 in El Salvador and needed to find a way back to the United States.

18

(2RT 291, 311-312.) Before the Skype interview, Curtis told Gomez he was
trying to get a visa for appellant but that appellant was also willing to return to the
United States illegally. (2RT 294.) Gomez knew there was no way to extradite
appellant from El Salvador. (2RT 294-295.) During the Skype interview Gomez
told appellant it was possible he would have to do some jail time, that saying he
was involved might help him, but Gomez would have to speak with the district
attorney. (2RT 315-318, 329.) Gomez never told appellant he could face life in
prison for murder and he agreed appellant thought he was just going to be a
witness. (2RT 319.)

Gomez's second interview with appellant occurred after he was
arrested in the United States; appellant asked about how much jail time he would
have to do and if he would be a legal citizen once released. (2RT 303.) He said
Curtis had been planning to help him stay in the United States legally, but later
said there was nothing he could do. (CT 168, 179; 2RT 333-334.)

C.        **The Trial Court's Ruling.**

At the end of the evidentiary hearing the court heard arguments and
ultimately ruled appellant's statements were voluntarily and not induced by any
express or implied promises of leniency. (2RT 336-401.) The court found
appellant had a motive to return to the United States, that he had "a certain degree
of sophistication" having been deported three times. (2RT 389-390.) It
acknowledged appellant expressed fear of staying in El Salvador but noted he had
no contact with MS-13 for seven years, he spoke freely with Curtis at the airport,
he had awareness of the witness protection program, and the first interview was
merely an intelligence gathering session. (2RT 390-391.) The court concluded
appellant did not think he was being given a free pass, that it was "hard to believe"
appellant expected to be able to confess to committing a murder, return to the
United States, and face no consequences of prosecution and incarceration for the
murder. (2RT 391.) The court found that, at best, Curtis generalized the possible

19

benefits and appellant "immediately volunteered information" and wound up
confessing. (2RT 391.) Thus, the court concluded there was no evidence
appellant's statements were involuntary and his will was not overborne. (2RT
391, 400.)

D.       **The Voluntariness of a Confession Is Determined By**
         **Considering the Totality of the Circumstances.**

"Both the state and federal Constitutions bar the prosecution from
introducing a defendant's involuntary confession into evidence at trial.
[Citations.] '"A statement is involuntary if it is not the product of '"a rational
intellect and free will."' [Citation.] The test for determining whether a confession
is voluntary is whether the defendant's 'will was overborne at the time he
confessed.'"' [Citations.]" (*People v. Linton* (2013) 56 Cal.4th 1146, 1176; U.S.
Const. 5th & 14th Amends.) A confession may be found to be involuntary if it
was obtained by either direct or implied promises. (*Ibid.*) And it is the People's
burden to show by a preponderance of the evidence that a confession is voluntary.
(*Ibid.*)

In deciding whether a statement was involuntary, the reviewing
court '"must examine the uncontradicted facts surrounding the making of the
statements to determine independently whether the prosecution met its burden and
proved that the statements were voluntarily given without previous inducement,
intimidation or threat. [Citations.]"' (*People v. Thompson* (1990) 50 Cal.3d 134,
166.) In considering the totality of the circumstances, "no single factor is
dispositive." (*People v. Williams* (1997) 16 Cal.4th 635, 660-661; see also
*Withrow v. Williams* (1993) 507 U.S. 680, 693 [113 S.Ct. 1745, 123 L.Ed.2d
407].)

The reviewing court conducts an independent review of the trial
court's legal determination of whether a confession was voluntarily made and
relies on the trial court's findings on any disputed facts if they are supported by

substantial evidence. (*People v. Linton, supra,* 56 Cal.4th at pp. 1176-1177; see also *People v. Carrington* (2009) 47 Cal.4th 145, 169.)

E.       **The Court's Finding No Implied Promise of a Significant Advantage Had Been Made to Appellant is not Supported by Substantial Evidence.**

The motivating cause of appellant's decision to tell Curtis about his involvement in Palacios' murder was his fear MS-13 would kill him if he remained in El Salvador and Curtis's implied promise that he could legally return to the United States *as a witness* if he provided verifiable information of his personal involvement in a crime attributable to MS-13.

The Court of Appeal disagreed and concluded no evidence existed to show Curtis exploited this fear. (Exh. A, Opn. 22-23.) But to the contrary, the evidence showed Curtis had foreknowledge of appellant's fear and specifically selected him from a the group of returning deportees and went to the airport in order to interview him based on information he obtained from paperwork relating to appellant's current and past deportations. (1RT 18-21, 32, 35-36, 104, 166-167, 227.) Appellant had previously sought asylum because of his fear of MS-13 and their threat to kill him; it is reasonable to infer Curtis was well aware appellant's life was in danger in El Salvador, that he was vulnerable to being killed, and thus likely to cooperate in providing information about MS-13 if offered the chance to return to the United States as a witness.

The totality of the circumstances—which included, among other things, appellant's limited education, his lack of experience in the criminal justice system, his extreme fear of MS-13—Agent Curtis' failure to tell appellant he had a right not to incriminate himself and failure to tell him he could be prosecuted for any crimes he admitted committing or that he could potentially serve the rest of his life in prison if convicted of murder, showed appellant's confession was not voluntary but had been induced by the agent's implied promise of a visa and other

documents that would allow appellant to lawfully return to the United States,
testify as a witness, and remain there to live freely afterward.

The prosecutor did not offer any evidence to show appellant had
ever previously been arrested from a crime or had ever been advised of his rights
or understood those rights when he met with Curtis.  While appellant had been
deported three times and once spent several months in federal custody as a result,
there was no evidence to show he understood how the criminal justice system
works in the United States and there was no evidence offered to show Agent
Curtis advised him of his rights.

The trial court appeared to give weight to the fact the interview was
in a noncustodial setting and that Curtis had no knowledge ahead of time of the
crimes to which appellant confessed.  (2RT 390-391.)  However, the lack of any
advisement of rights is necessarily a factor to be considered in assessing the
voluntariness of appellant's confession.  In a noncustodial interrogation, the
absence of any kind of warnings is relevant evidence as to whether the questioning
was coercive.  (*Beckwith v. United States* (1976) 425 U.S. 341, 347-348 [96 S.Ct.
1612, 48 L.Ed.2d 1].)

The trial court acknowledged appellant expressed fear of remaining
in El Salvador but appeared to question the extent of that fear because appellant
had managed to have no contact with MS-13 in the seven years since he had left
the Los Angeles area.  (2RT 390.)  The evidence of appellant's fear of being
killed, however, was undisputed.

Appellant left California and went to Texas in November 2005
because he was afraid MS-13 would kill him.  (2TR 260, 274.)  There were no
MS-13 gang members in the area where he lived in Texas, so he did not feel in
danger from them there.  (1RT 207.)  When he was deported in 2006, he was
kidnapped by the gang in El Salvador and only managed to get away when police
came and the gang members ran away.  (1RT 208-209.)  Being kidnapped like that

and threatened had made him fear the gang even more. (2RT 260.) Appellant reentered the United States illegally a few months later and he returned to Texas. (1RT 212-213.) MS-13 did not find him there. (1RT 214.) When he was deported in 2011, he requested asylum because the gang had threatened to kill him, but without any documents to show his life had been threatened, he had no way to gain asylum. (1RT 216; 2RT 257-258, 274-275.) A week after being deported that second time, appellant left El Salvador to reenter the United States a third time where he lived in Houston with family. (1RT 216-220.)

Appellant's last contact with MS-13 was in 2006. (1RT 221.) Since then, he actively tried to avoid contact with the gang; he knew they still wanted to kill him for not complying with their direction in 2006 to kill three other people. (1RT 222; 2RT 261-262.) While not in immediate fear at the airport, he was still fearful for his life if he remained in El Salvador since no one was permitted to leave the gang. (1RT 223, 258.) People who left were killed. (2RT 259.)

The prosecutor attempted to show appellant did not fear for his life in El Salvador because, between meetings with Curtis, appellant went to Guatemala and got a tattoo. (2RT 266-268.) But for the most part, he barely left the house and waited for his family to put together enough money for him to leave the country to come back to the United States. (2RT 261-262.) Appellant's testimony, which was undisputed, showed he went to Guatemala after his first interview with Curtis to see what the situation was for crossing back over to the United States illegally. (1RT 179-180.) He told Curtis he would return by illegal means if Curtis could not help him. (1RT 179-180.) On the whole, appellant's behavior was consistent with being in fear for his life because of MS-13.

The evidence also showed Curtis specifically selected appellant for the interview because Curtis had information about appellant's connection with MS-13 from a database of known members of MS-13. (1RT 18. 20.) The fact the FBI and the El Salvadoran officers formed a task force to gather intelligence on

23

MS-13 and other gangs to obtain evidence to help solve gang-related crimes speaks volumes. (1RT 17-18, 20-22.) Curtis worked with a Transnational Anti-Gang Task Force made up of El Salvadoran police; together they would go to the airport to speak with incoming deportees to see if they had information on unsolved gang-related crimes. (1RT 17-18, 21.) This evidence also supports appellant's testimony that MS-13 is a dangerous gang.

In short, the evidence showed there was a credible threat appellant's life was in danger from MS-13, that he communicated his fear to Curtis at the airport, and Curtis already knew about it from the paperwork he reviewed. (1RT 174.) Hearing Curtis could get him a visa to return to the United States if he had firsthand knowledge of about crimes MS-13 had committed there, appellant believed he had to tell Curtis about his involvement in Palacios' murder to get a visa and avoid being killed by MS-13. (1RT 173-176.) This evidence supports finding that the confession was involuntary because it was induced by an implied promise of benefit or advantage predicated on Curtis' awareness of appellant's fear remaining in El Salvador and being killed by MS-13.

A confession made as the result of an express or implied promise of leniency, benefit or advantage that was the motivating cause of the defendant's decision to confess is involuntary and inadmissible at trial as a matter of law. (*People v. Boyde* (1988) 46 Cal.3d 212, 238; see also *Bram v. United States* (1897) 168 U.S. 532, 542-543 [18 S.Ct. 183. 42 L.Ed. 568].) """It is well settled that a confession is involuntary and therefore inadmissible if it was elicited by any promise of benefit or leniency *whether express or implied*. [Citations.]"' [Citations.]" (*In re Shawn D., supra*, 20 Cal.App.4th at p. 210.)

In *Arizona v. Fulminante* (1991) 499 U.S. 279 [111 S.Ct. 1246, 113 L.Ed.2d 302], the Court applied the totality of the circumstances to conclude the defendant's confession had been involuntary. There, while in prison, a fellow inmate, who was also an informant for the FBI, gained the defendant's confidence

24

and offered him protection from other inmates who had heard rumors the defendant had killed a child: but in exchange, the informant told the defendant he first had to tell him everything about the crime. (*Id.* at pp. 286-288.) The informant was aware the defendant had been receiving rough treatment from other inmates and played upon that fear. (*Id.* at p. 288.) The Court agreed the confession had been coerced and the defendant's will overborne based on "a credible threat of physical violence." (*Id.* at pp. 287-288.)

Similarly here, appellant's will was overborne when Curtis offered him a way to return legally to the United States; appellant only had to tell Curtis about crimes he participated in with MS-13 to get that significant advantage.

The fact the trial court found it hard to believe appellant thought he would just be a witness and that appellant was not credible is not supported by substantial evidence. To the contrary, the record shows neither Curtis nor Gomez ever told appellant he would be anything other than a witness.

In addition, while the court appeared to question the veracity of appellant's testimony that he told Curtis during the first interview he feared for his life, Curtis only testified that he could not recall or remember this happening in the first interview; that lack of recollection is not evidence disputing appellant's testimony to the contrary. That aspect of the first interview is a key factor to be considered in determining whether the People met their burden to show a confession was voluntary under the totality of the circumstances.

It is settled that a court's disbelief of a defendant's testimony—without affirmative evidence to the contrary—is not sufficient to meet the People's burden to show a confession was voluntarily made. (*People v. Jimenez* (1978) 21 Cal.3d 595, 613, overruled on a different ground in *People v. Cahill* (1993) 5 Cal.4th 478, 510, fn. 17.) The *Jimenez* court found that a failure of recollection did not constitute a contradiction of the defendant's statement that the police made a promise of leniency in exchange for his confession. (*People v.*

25

*Jimenez, supra,* 21 Cal.3d at p. 612.) And because it was the prosecutor's burden to prove no express or implied promise of leniency had been made, the failure to offer evidence contradicting the defendant's testimony that there had been such a promise showed the prosecution failed to meet its burden of proof. (*Id.* at pp. 612-613.) "[W]here the People had the burden of proof on the issue of the voluntariness of defendant's confession, it is apparent that disbelief by the trial court of defendant's testimony would not suffice as a substitute for an affirmative showing by the People sufficient to discharge their burden." (*Id.* at p. 613.)

In addition, appellant's only made his confession to Curtis because he was induced to do so by a promise of a significant advantage—that he would be able to leave El Salvador, where he feared for his life, and return to the United States legally. The fact Curtis denied making an *express* promise of a significant advantage to appellant does not mean he did not make an *implied* promise of one. A confession may involuntary if it was obtained by either direct or implied promises. (*People v. Linton, supra,* 56 Cal.4th at p. 1176.) Curtis essentially offered appellant protection by offering the advantage of lawfully reentering the United States in exchange for information about crimes he had witnessed or personally helped MS-13 gang members commit. Despite his lack of recollection, the evidence as a whole showed Curtis knew ahead of time that the offer of a visa was likely to induce appellant to confess to crimes he committed with MS-13 so he could return to the United States where he felt safer.

The trial court also failed to consider the use of deception as a factor, which it clearly was. Curtis employed deception by failing to tell appellant that his confession to participating in a gang-related crime, particularly, murder, could result in his conviction and sentence to prison for a significant period of time and possibly, as has happened, the rest of his lifetime. Instead, Curtis fostered the belief that appellant would only be a witness and even though, as appellant was later told, he could do some jail time.

26

The trial court found it "hard to believe" appellant expected to be able to confess to murder and be able to return to the United States without there being "any consequences of incarceration, prosecution." (2RT 391.) But the trial court did not discuss, and thus appears to have failed to even consider, the agent's use of deception leading appellant to believe he would just be a witness and possibly do some jail time because there were no safe houses where he could stay due to the recession. None of that testimony was contradicted or disputed. Curtis acknowledged they discussed witness protection but he did not go into any detail about that part of the conversation. (1RT 39-40, 86.) In contrast, appellant's uncontradicted testimony was that Curtis said no safe houses were available due to the recession and that was why appellant might have to spend some time in jail before testifying as a witness. (1RT 182, 238; 2RT 264.)

"While the use of deception or communication of false information to a suspect does not alone render a resulting statement involuntary [citation], such deception is a factor which weighs against a finding of voluntariness [citations]." (*People v. Hogan* (1982) 31 Cal.3d 815, 840-841, disapproved of on a different ground in *People v. Cooper* (1991) 53 Cal.3d 771, 836; see also *People v. Hoyt* (2020) 8 Cal.5th 892, 934.) In addition, "[s]ilence by a government agent can only be equated with an affirmative misrepresentation where there is a legal or moral duty to speak or where an inquiry left unanswered would be intentionally misleading." (*United States v. Okwumabua* (2d Cir. 1987) 828 F.2d 950, 953.) These additional factors support finding the confession was involuntarily induced.

Curtis's purpose in speaking to appellant, who he knew had been a member of MS-13, was to gain intelligence to help solve unsolved gang-related crimes. (1RT 20-21.) It was Curtis' decision whether a deportee would become a source. (1RT 27-28.) Curtis admitted telling appellant that getting him a visa to return to the United States was a possibility. The motivating cause behind appellant's decision to tell Curtis he had been involved in two gang-related

27

murders was Curtis' implied promise that he would be able to escape the clutches
of MS-13 in El Salvador and return to the United States as a witness—appellant
had no other motivation. Under the totality of the circumstances, appellant's
confession was induced by an implied promise of a significant advantage and it
was therefore involuntary.

  If review is granted and it is determined appellant's confession to
Agent Curtis was involuntary, the judgment of conviction must be reversed
because its use at trial violated appellant's right to due process of law. (*Colorado
v. Connelly* (1986) 479 U.S. 157, 167 [107 S.Ct. 515, 93 L.Ed.2d 473]; *People v.
Neal* (2003) 31 Cal.4th 63, 79; see also *Jackson v. Denno* (1964) 378 U.S. 368,
384 [84 S.Ct. 1774, 12 L.Ed.2d 908].) An involuntary statement cannot be used
against the accused in a criminal case for any purpose, including impeachment if
he or she gives inconsistent testimony at trial. (*Mincey v. Arizona* (1978) 437 U.S.
385, 398 [98 S.Ct. 2408, 57 L.Ed.2d 290]; *Cooper v. Dupnik* (9th Cir. 1992) 963
F.2d 1220, 1250.) And evidence considered fruit of the involuntary confession is
likewise inadmissible. (*Wong Sun v. United States* (1963) 371 U.S. 471, 491 [83
S.Ct. 407, 9 L.Ed.2d 441]; *People v. Beardslee* (1991) 53 Cal.3d 68, 108.)

  In addition, appellant's subsequent statements to Investigator Gomez
and his decision to testify at trial cannot be relied upon to uphold the murder
conviction. "[W]hen an accused who has been subjected to improper influences
makes a confession, and shortly thereafter again incriminates himself, ' . . . there is
a presumption that the influence of the prior improper treatment continues to
operate on the mind of the defendant and that the subsequent confession is the
result of the same influence which rendered the prior confession inadmissible, and
the burden is upon the prosecution to clearly establish the contrary. [Citations.]'
[Citation.]" (*People v. Jiminez, supra,* 21 Cal.3d at p. 614.) Thus, subsequent
confessions are subject to exclusion where it appears the improper conduct
continued to influence the defendant's mind. (*Leyra v. Denno* (1954) 347 U.S.

556, 561 [74 S.Ct. 716, 98 L.Ed.2d 948]; *People v. Adams* (1983) 143 Cal.App.3d
970, 991, disapproved on a different ground in *People v. Hill* (1992) 3 Cal.4th
959, 995, fn. 3.)

By the same token, a defendant who testifies at trial after his
involuntary confessions were illegally introduced against him at trial cannot have
his testimony used against him later on. (*Harrison v. United States* (1968) 392
U.S. 219, 222 [88 S.Ct. 2008, 20 L.Ed.2d 1047]; see also *Lujan v. Garcia* (9th Cir.
2013) 734 F.3d 917, 925.) "The question is not *whether* the [defendant] made a
knowing decision to testify, but *why*. If he did so in order to overcome the impact
of confessions illegally obtained and hence improperly introduced, then his
testimony was tainted by the same illegality that rendered the confessions
themselves inadmissible." (*Harrison v. United States, supra,* 392 U.S. at p. 223.)
Furthermore, it is the People's burden to show the government's illegal action did
not induce such testimony. (*Id.* at pp. 225-226.)

The confessions admitted as evidence at trial were critical to the
prosecution's case. Had they been excluded, there is no reasonable basis to
believe a jury would have convicted appellant since his statements constituted the
sole evidence connecting him to Palacios' murder. Moreover, the error in
admitting an involuntary confession cannot be deemed harmless when it is
unlikely the case would have been prosecuted at all in the absence of such
evidence. (*Arizona v. Fulminante, supra*, 499 U.S. at pp. 297-298.)

Accordingly, appellant urges this court to grant review.

29

## CONCLUSION

For all of the foregoing reasons, appellant respectfully requests that the court grant his petition for review.

August 3, 2022                                    Respectfully submitted,

Patricia L. Brisbois
State Bar No. 167180
Attorney for Appellant
Herbert Cornejo Mendez

## CERTIFICATION OF WORD COUNT

I, Patricia L. Brisbois, hereby certify that, according to the computer program used to prepare this document, PETITION FOR REVIEW, contains 8,352 words.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 3rd day of August 2022, in Tualatin, Oregon.

Patricia L. Brisbois

30

## DECLARATION OF SERVICE

Case Name:  People v. Herbert Cornejo Mendez                No. D078710

    I, Patricia L. Brisbois, declare:  I am an active member of the State Bar of California and am not a party to the above-entitled action.  My business address is P.O. Box 518, Tualatin, Oregon 97062.  I served the attached: APPELLANT'S PETITION FOR REVIEW placing true copies thereof in a separate sealed envelope, with correct postage, and depositing them in the United States Postal Service, to each addressee named hereafter, addressed to each such addressee respectively as follows on August 3, 2022.

Herbert Cornejo Mendez #BA3229
PBSP Unit D-9-102
P.O. Box 7500
Crescent City, CA  95532

### PROOF OF SERVICE BY ELECTRONIC SERVICE
(Cal. Rules of Court, rules 2.251(i)(1)(A)-(D) & 8.71(f)(1)(A)-(D))

    Furthermore, I, Patricia L. Brisbois, declare that on August 3, 2022, I electronically filed in the Court of Appeal from the True Filing website (www.tf3.truefiling.com) the above-referenced document and then e-served the entities listed below:

Appellate Defender's Inc.                   Attorney General's Office
(eservice-court@adi-sandiego.com)          (sdag.docketing@doj.ca.gov)

DDA Jacob Silva                             Hon. James S. Hawkins, Judge
(Appellate-unit@rivcoda.org)               (appealsteam@riverside.courts.ca.gov)

DPD Laura Garcia
(LOPDAppellateUnit@rivco.org)

    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and this declaration was executed at Tualatin, Oregon, on August 3, 2022.

PATRICIA L. BRISBOIS              _____
(Typed Name)                     (Signature)



US POSTAGE

PRIORITY MAIL
IMI
$011.45⁰
04/19/2023 ZIP 95532
043M22005800

quadient

CSO ROYBAL
X-RAYED
RECEIVED

APR 21 2023

CLERK U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

Clerk of the United State District Court
for the Central District of California
ATTN: Intake/Docket Section
255 East Temple Street, Suite TS-134
Los Angeles, California 90012

Herbert Cornejo Mendez #JA3229
Pelican Bay State Prison
P.O. Box 7500
Crescent City, California 95532

C/o R. ADAMS 4-18-23